Filed 12/27/22  In re M.C. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

|  |  |
|---|---|
| In re M.C. et al., Persons Coming Under the Juvenile Court Law. | B314351 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>M.C.,<br><br>　　　Defendant and Appellant. | (Los Angeles County Super. Ct. Nos. 20CCJP01697A, 20CCJP01697B, 20CCJP01697C) |

APPEAL from orders of the Superior Court of Los Angeles County, Philip L. Soto, Judge.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

_____

M.C. (father) appeals the juvenile court's order terminating jurisdiction and issuing custody orders under Welfare and Institutions Code section 362.4[1] granting mother full legal and physical custody of parents' three children, and granting father monitored visits with the two older children. Father contends the court abused its discretion because he had completed his case plan. Respondent Los Angeles County Department of Children and Family Services (Department) contends the court's order was within its discretion, in light of father's extensive criminal history, an existing 10-year criminal protective order preventing father from having contact with mother or their youngest child, and evidence that father remained emotionally unstable and lacked insight into the reasons why his conduct posed a danger to the children. We affirm.

---

[1] Statutory references are to the Welfare and Institutions Code unless otherwise indicated.

# FACTUAL AND PROCEDURAL BACKGROUND[2]

## I. Prior Appeal

*Family Background and Overview*

The family consists of father, L.W. (mother), and their three children M.C. (born February 2014), S.C. (born December 2015), and R.C. (born November 2016).  By June 2020, mother and father had known each other for 15 years and had been in a relationship for six years.  Father has a lengthy criminal history, including two separate felony convictions.  Father's most recent felony conviction occurred in 2012, when he pled guilty to possessing child pornography.  Mother was aware of father's status as a registered sex offender but did not believe he had done anything inappropriate to anyone and did not see why father was considered a sex offender.  Mother denied ever seeing any signs of father engaging in concerning behavior with their children or any other children.

*Father's Criminal History, Including His Arrest and Conviction for Possession of Child Pornography*

Father acknowledged having a lengthy criminal record, starting in 2000 at the age of 21.  After attending a funeral, he

___

[2] Part I the factual and procedural background is taken from a nonpublished opinion from a prior appeal.  (*In re M.C.* (Jan. 12, 2022, B309591).)  On this court's own motion, we take judicial notice of our prior unpublished opinion.  (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

got into an argument with someone, his gun went off, and after being arrested and charged, he went to prison for a year. In 2004, father was convicted for assault and sentenced to four years in prison when he got into an argument with his neighbor while smoking marijuana.

In 2010, shortly after being released from jail for driving under the influence , father was arrested for possession of child pornography. Father's CLETS report shows a February 2012 felony conviction for violating Penal Code section 311.11, subdivision (a), possession of obscene materials depicting minors, with a three-year prison sentence and five years of probation. On December 2, 2014, father completed a 52-session cognitive behavioral therapy program in sex offender treatment.

Between 2014 and 2016, father had several convictions for more minor misdemeanor offenses, like driving without a license and violating probation by failing to register as a sex offender. In February 2018, father was convicted of misdemeanor battery against a peace officer. He received a sentence of 22 days in jail and 36 months of probation.

*2019 Domestic Violence Incident*

While mother and father acknowledged past arguments, including some involving physical hitting, they both denied any domestic violence requiring police involvement prior to an incident in February 2019. Describing the February 2019 domestic violence incident to the social worker, mother said father "was being a certain way. He kept coming at me. He pulled off my sweatshirt." Law enforcement was called, and father was arrested. Father claimed mother overreacted and

exaggerated the incident. According to father, he and mother were arguing while he was in the kitchen chopping food, and she was in the living room. He walked to the living room while still holding a knife, and she started yelling "he's going to kill me!" The police were called, and when they arrived, father was holding R.C. Father claimed that despite being afraid for his own life, when the police asked him to put R.C. down, he complied, and the police tased him and shot him several times with rubber bullets before arresting him.

Father was charged with four counts: (1) inflicting corporal injury on a spouse (Pen. Code, § 273.5, subd. (a)); (2) assault with a deadly weapon not a firearm (*id.*, § 243, subd. (c)); (3) obstructing or resisting an officer (*id.*, § 69); and (4) child cruelty (*id.*, § 273, subd. (a)). The criminal court issued a protective order protecting both mother and R.C., presumably because father was holding R.C. when law enforcement arrived. Father remained in jail until paternal grandmother bailed him out 10 months later, and the criminal case against him remained open at the time of the jurisdictional hearing.

*Father's Drug Use History*

Father acknowledged using drugs, but denied any drug addiction or drug abuse. Father claimed he is able to stay sober on his own, and did so for two years while in prison. He uses methamphetamine and marijuana, and has experimented with acid, mushrooms, and cocaine. The last time he used methamphetamine was in 2019 prior to his arrest for domestic violence. He smokes marijuana at night during the week, but he

5

does not smoke in the children's presence and keeps the marijuana in a locked box inside the garage.

*Prior Referrals*

In April 2016, the Department filed a petition seeking to have M.C. and S.C. declared dependents and alleging that father had a history of substance abuse, was a current abuser of marijuana, mother failed to protect the children, the children had access to the parents' marijuana paraphernalia, father had a criminal history of a conviction for possession of obscene child pornography, was a registered sex offender, and was currently incarcerated for failing to register with law enforcement. The juvenile court dismissed the petition without prejudice in July 2016. A December 2016 referral alleging neglect and sexual abuse was investigated and determined to be unfounded.

A February 2019 referral raised concerns about father emotionally and physically abusing the children. The Department learned that when police responded to the home after the February 2019 domestic violence incident, father had used R.C. "as a shield to deter the police from entering the residence or taking him into custody." The Department noted that father appeared to suffer from mental health issues and was self-medicating with marijuana and methamphetamine. The referral was substantiated as to R.C., but was closed because safety measures were already in place. Specifically, while mother denied the domestic violence incident occurred and did not believe father was a threat to the children, she also reported that because of father's sex offender status, she never allowed him to be alone with the children. In addition, father was incarcerated

following his arrest for domestic violence, and the criminal court had issued a 10-year restraining order protecting mother and R.C. from father. Mother was adamant about following the court orders even though she did not fully agree with them, and she declined any additional services from the Department. The investigating social worker later reported that she closed the investigation because father was incarcerated, and it appeared that he would remain incarcerated for a long time.

*Department's Investigation Into the Current Allegations*

A. <u>Initial referrals and emergency investigation</u>

On February 14, 2020, the Department received a referral of potential neglect. The reporting party explained that mother was allowing M.C. and S.C. to live with father, who was a registered sex offender and who had mental health issues. Three days later, the Department received a second referral when mother and father took all three children to the emergency room at Harbor UCLA, a local hospital, based on father's concerns that M.C. had been sexually molested. Father told the reporting party that M.C. had stated mother allowed men to enter the home and spray milk on the children's faces while mother recorded the act.[3] Mother denied any such activity.

---

[3] Because no party has appealed the court's decision to dismiss the petition allegation concerning failure to protect from sex abuse (count b-1), we do not discuss at any length the evidence relating to that count, except as it might pertain to the counts currently under appeal. Interviews with the school and

7

A Department social worker responded to the emergency referral at the emergency room, and interviewed the treating nurse, mother, M.C., and S.C. The Harbor UCLA nurse explained that while no signs of sexual abuse were evident, the hospital was concerned because father initially took M.C. to a different hospital two weeks earlier, but did not act immediately when the first hospital told him they did not service children and recommended he take M.C. to Harbor UCLA. According to the nurse, father appeared coherent and showed no signs of mental illness, but mother told the nurse father suffers from mental illness and abuses drugs. Upon discovering the 10-year restraining order protecting mother and R.C. from father, a hospital deputy asked father to leave, and father complied. Speaking to the social worker, both M.C. and S.C. denied any mistreatment. However, after initially denying that anyone had touched her private parts, M.C. became animated and said someone had touched her on her "nana," and explained he was wearing a green hat and broke her toy.

Mother told the social worker M.C. and S.C. have been staying with father and paternal grandmother for about a month, and confirmed the 10-year restraining order protecting her and R.C. from father. Mother said she was not in the habit of violating the order, but father had been told to take M.C. to Harbor UCLA, and because he insisted on taking her today, mother and R.C. were at the hospital with father. Mother denied the children had been sexually abused. Mother did not believe father would harm the children, but she was concerned about his mental health. Father confirmed mother's explanation for why

_____

the children did not raise any red flags until father violated the safety plan by picking M.C. up from school.

they were both at Harbor UCLA at the same time, and agreed to be interviewed by the social worker after mother drove him home.

The social worker interviewed father at his home later the same day. Father denied any mental health issues, explaining he was concerned for his daughters because M.C. and S.C. had reported on separate occasions that mother's friends were touching M.C., spraying white stuff on her, and taking pictures and video. Father said mother denied the children's claims, and no one believes him because the children will not cooperate when questioned. He acknowledged past methamphetamine use, and told the social worker he was willing to drug test and would go to the hospital tomorrow for a mental health evaluation. He also acknowledged he was a registered sex offender, but he never touched anyone and did not have any restrictions with his children.

The parents signed a safety plan agreeing that father would not be left alone with the children during the Department's investigation, father would receive drug testing and a mental health evaluation, and the children would have forensic interviews. The investigation was transferred from an emergency social worker (McDonald) to another social worker (Byrd).

B. Additional interviews and investigation

Between February 20 and 27, social worker Byrd interviewed M.C., S.C., M.C.'s teacher and principal, and father. Mother consented to M.C. and S.C.'s interviews, but mother was not available to be interviewed. M.C.'s teacher stated that she had never met mother, and M.C. was usually picked up by father,

9

paternal uncle, or paternal grandmother. The teacher told the social worker that the day before, father had picked up M.C., and was not accompanied by anyone. During M.C.'s interview, M.C. made statements to the social worker consistent with father's concerns about sex abuse.

During a February 27, 2020 interview, father reviewed his history of drug use. In response to questions about the February 2019 incident, father denied any domestic violence, claiming mother lied about him hitting her. He said mother told law enforcement he was bipolar and off his medications, and he was using methamphetamine. When the social worker asked father why he violated the safety plan by picking M.C. up from school by himself, father admitted doing so and apologized. Father lives in a four-bedroom home with paternal uncle and paternal grandmother, and the social worker observed it was dirty, cluttered, and unorganized, with evidence of hoarding. Father sleeps on a couch in the living room and the children sleep on an air mattress near the couch. The social worker developed a new safety plan with father agreeing to clean up the house, abide by the restraining order, not to pick up the children from school or day care or be around them without supervision, and not to question the children regarding sexual abuse.

### C. Father's mental health assessment

The social worker requested an assessment of father, based on concerns about father's substance use and his mental health, including father's suspicion that his children are being sexually abused. The Department was concerned father "may be suffering from underlying mental health issues that may account for

10

possible delusional/paranoid ideation." The assessment took place on February 29, 2020, and the report concluded that father's suspicions about potential sexual abuse of his children "may be a cognitive distortion and concomitant bi-product [*sic*] of his meth abuse." Father had reported using meth from 2005 until relatively recently, admitting that while he had been sober since 2018, he had slipped a couple of times. The report also noted father's extensive criminal history, linking it to poor impulse control and judgment and placing father's parental capacity at risk.

### D. M.C.'s forensic interview

A Department social worker conducted a videotaped forensic interview of M.C. on March 17, 2020. During the interview, M.C. described "a guy" who picked her up at school, took her to her mother's house, and put his finger inside her vagina. M.C. said she bit the guy's finger, and he was bleeding. Several times during the interview, M.C. clarified, without prompting, that "the guy" was not father. M.C. also described a separate occasion where a guy picked her up and took her to Walmart, but there were no toys.

*Detention and Petition Allegations*

The court entered a removal order on March 20, 2020. The social worker then spoke to both mother and father, and on March 23, 2020, mother and paternal grandmother brought the children to Department offices, where they were transported to their foster placements. When paternal grandmother inquired

11

about relative placement, the social worker recommended she raise that in court at the detention hearing.

The dependency petition as initially filed on March 25, 2020, included two identical counts under subdivisions (b) and (d) relating to the risk of sexual abuse (counts b-1 and d-1),[4] and two additional counts, one relating to father's history of substance abuse (count b-2) and one relating to his prior conviction for possession of child pornography (count b-3).[5]

On July 7, 2020, the Department filed an amended petition adding a fourth count relating to domestic violence (count b-4). The new allegation stated, "[Mother and father] have a history of engaging in violent verbal and physical altercations. On 02/26/2019 the father was arrested for [section] 243.5[, subdivision] (A)(1) [of the] P[enal] C[ode]—Inflict Corporal Inj Spouse/Cohab and [section] 273[, subdivision] (A) [of the] P[enal]

---

[4] Counts b-1 and d-1 alleged that an unknown person sexually touched M.C., and such conduct would not occur absent unreasonable and neglectful acts by mother and father. Such unreasonable and neglectful acts place M.C. and her siblings, S.C. and R.C., at risk of harm.

[5] Count b-2 alleged that father's history of substance abuse "including methamphetamine, cocaine and LSD" and current abuse of marijuana renders father incapable of providing regular care of the children. Mother was aware of father's substance abuse and failed to protect the children by allowing M.C. and S.C. to reside in father's home.

Count b-3 alleged: "[Father] has a history of a criminal conviction of Possess Obscene Material of Child Pornography. The father is a Registered Sex Offender. The father's criminal history and conduct endanger the children's physical health and safety, and places the children at risk of serious physical harm and damage."

12

C[ode]—Child Cruelty:  POS Injury/Death.  As a result [ ] the mother and child [R.C.] were issued a 10 year restraining order which is currently active.  Such violent conduct on the part of the father and the mother's failure to protect the children endangers the children's physical health and safety and places the children at risk of serious physical harm, damage, danger and failure to protect."

*Adjudication and Disposition*

The adjudication hearing took place on October 23, 2020. The court admitted the Department's reports into evidence, as well as a transcript of M.C.'s forensic interview.  The court noted it had watched the full video.  After hearing argument from all parties and brief testimony by mother, the court dismissed counts b-1, d-1, and j-1 (sex abuse) as well as count b-2 (substance abuse).  The court found true counts b-3 (child pornography conviction) and b-4 (domestic violence).

Turning to disposition, the court ordered all three children removed from father and placed with mother, making findings as to father under section 361, subdivision (c), and a finding of detriment if father was non-custodial.  The court ordered enhancement services (not reunification services) for father, and emphasized that if a risk still existed after six months of services, the case would be closed with father having monitored visits. Father could address sexual abuse awareness in individual counseling, and submit to drug tests on reasonable suspicion. The court granted father monitored visits with M.C. and S.C., but expressly restricted father from discussing case issues with them and clarified that mother was responsible for arranging

13

transportation and she could not permit father to pick the children up alone.  The court ordered father to undergo a psychological assessment.

## II. Resolution of Prior Appeal

In July 2021, while the prior appeal remained pending, the juvenile court terminated jurisdiction over the children and entered a custody order granting mother and father joint legal custody.  On January 12, 2022, this court affirmed the juvenile court's jurisdictional findings based on domestic violence and dismissed the portions of father's appeal challenging the court's removal order and the jurisdictional finding based on father's prior child pornography possession conviction.  (*In re M.C.*, *supra*, B309591.)

## III.   Additional Facts and Procedure

*Department's Reports*

In April 2021, the Department reported the children were doing well in mother's care.  Mother was in full compliance with court orders, having taken a 10-week parenting class, a 12-week domestic violence support program, and continued participating in weekly individual counseling.  Father had also completed a 10-week parenting class and obtained a psychological assessment, but was only in partial compliance with the court's order to participate in individual counseling to address case issues, including sex abuse awareness.  A July 2, 2020 letter from Carly Chan, a counselor at the Rio Hondo Mental Health Center, stated

that father had presented for intake in June 2019 and was participating in treatment. Father reported the counselor told him in December 2020 that he no longer needed mental health services. Because father had not signed a consent form, the social worker was unable to obtain additional information from the counselor.

The Department also reported problems with father's visits, including issues with scheduling and with father and paternal grandmother impermissibly asking the children about mother. In a section titled family's perception of their needs, father was quoted as saying, "I believe I have learned allot and am truly remorseful for the stress I have caused on my children. Had I understood better I would have completed all of the Court's requirements and I longfully wish to be reunited with my children."

According to the Department's July 2021 report, father had changed his plea from "not[ ]guilty" to "nolo contendere" in his criminal case and was awaiting sentencing on charges of corporal injury to a spouse, child endangerment, and resisting an executive officer. The criminal court ordered father to complete a 90 to 120 day intensive live-in rehabilitation program, a 52-week domestic violence class, 30 days of community labor, and to comply with orders in the juvenile dependency case. Father was living in a rehabilitation program, which accommodated father's weekly monitored visits with the two older children. The children reported that father slept during part of a June 2021 visit, and the monitor entertained the children. Father reported the children wore him out with a water balloon fight. Father's phone visits were inconsistent; maternal grandmother would refuse father's phone calls because father would tell the children

he was going take them to amusement parks and they were going to be a family again. When father attempted to call mother, she hung up.

The social worker reported that while father was at times calm and easy to talk with, on at least one occasion he appeared "unstable as he yelled and ranted about mother being a racist and told [the social worker] that mother is going to take his children to New Mexico and sell them." Father also appeared upset about having to complete court-ordered classes, stating he had done them before the dependency case started. Twice, the social worker explained the case plan to father and provided him with a copy. Father reported that he had completed individual counseling in mid-December. When asked in June 2021 what he learned in his programs, father stated, "I learned allot of stuff, from parenting I learned about time outs and I statements." Father planned to transition to an outpatient program; he reported being aware of triggers such as vape clouds.

The children continued to be stable under mother's care, and the Department recommended terminating jurisdiction with an order awarding sole legal and physical custody of all three children to mother, with monitored visits for father.

*July 22, 2021 hearing*

At the July 22, 2021 family maintenance review hearing under section 364, the court admitted into evidence the Department's reports, as well as seven exhibits offered by father. The court stated it was inclined to follow the Department's recommendation to close the case with an order giving mother full physical and legal custody and father monitored visits, but it

16

had reviewed all of father's exhibits and would keep an open mind and consider father's argument for why father should get something other than monitored visits.

Father's evidence included a letter confirming father had received mental health services at Rio Hondo between June and December of 2020 as well as a full assessment report and treatment plan. According to the assessment report, father was seeking services due to concerns of depression after the children were detained from his custody. The treatment plan included psychological education and assisting father in developing at least two positive coping techniques. One of father's exhibits was a letter confirming he had been admitted to a residential drug and alcohol recovery program in April 2021, with a planned departure date was July 28, 2021. According to the letter, father actively participated, complied with program requirements, and consistently tested negative for illicit substances. Father's remaining exhibits were a certificate of completion showing that he had completed a 52-session sex offender treatment program in December 2014, a sign in sheet showing father's attendance in 2013 and 2014, a 2014 email from mother styled as a "To Whom It May Concern" letter explaining that father is not a danger and can be safely returned into society, handwritten notes about father's visits with the children in June and July 2021, and a letter and texts from paternal grandmother mostly focused on financial disputes between her and mother.

Father's attorney argued that father had completed all case plan requirements, having completed sex offender's group counseling, individual counseling, and having addressed the prior criminal conviction. Father sought an order for unmonitored visits and joint legal custody, arguing that mother interferes with

17

monitored visitation and that father will be deprived of meaningful contact with the children unless awarded joint legal custody and unmonitored visits. Mother's counsel noted she opposed father's request for joint legal custody, and both minor and mother submitted on the Department's recommendation. The Department pointed out that father's evidence indicated he had been using marijuana, and asked the court to specify that father was not to be under the influence during monitored visits, and he should abide by the criminal protective order prohibiting any contact with mother or the youngest child.

The court stated that after hearing argument and considering the evidence and department reports, it continued to agree that mother should have full legal and physical custody, with father having monitored visits with the two older children, and no visits with the youngest child unless and until the criminal court amended its protective order. The court emphasized that both parents should abide by the requirements of the criminal protective order, including limiting the contact between them to conform to that order. The court specified that father would have telephone visits twice a week monitored by mother, and monitored in-person visits would be at a neutral location. The court noted father's objection and asked minor's counsel to prepare the custody order. The custody order was filed the following day.

## DISCUSSION

"Once a child has been adjudged a dependent of the juvenile court pursuant to . . . section 300, . . . 'any issues regarding custodial rights between his or her parents shall be

18

determined solely by the juvenile court . . . so long as the child remains a dependent of the juvenile court.' " (*In re Anna T.* (2020) 55 Cal.App.5th 870, 876; § 302, subd. (c).) Section 364, subdivision (a) requires the juvenile court to conduct a review hearing every six months for a dependent child who has been placed in the physical custody of a parent. (See *In re T.S.* (2020) 52 Cal.App.5th 503, 512.) At a hearing held pursuant to section 364, the juvenile court must terminate jurisdiction over the dependent child unless the conditions that initially justified jurisdiction still exist or are likely to exist if supervision is withdrawn. (§ 364, subd. (c).)

In making a custody or visitation order pursuant to section 362.4,[6] the juvenile court's " 'focus and primary consideration must always be the best interests of the child.' " (*In re T.S.*, *supra*, 52 Cal.App.5th at p. 513.) "When the juvenile court makes custody or visitation orders as it terminates dependency jurisdiction, it does so as a court with 'a special responsibility to the child as *parens patriae* and [it] must look to the totality of a child's circumstances when making decisions regarding the child.' [Citation.] This remains true in the juvenile court's final orders issued before the court terminates jurisdiction." (*In re J.T.* (2014) 228 Cal.App.4th 953, 963.) " 'The presumption of parental fitness

---

[6] When terminating jurisdiction over a dependent child, section 362.4, subdivision (a) authorizes the juvenile court to issue "an order determining the custody of, or visitation with, the child." Section 362.4, subdivision (b) specifies that the order "shall continue until modified or terminated by a subsequent order of the superior court," and directs that the order be filed in a pending family court proceeding (*ibid.*) or if there is none, as part of a new family court file (*id.*, subd. (c)).

that underlies custody law in the family court . . . does not apply to dependency cases.  Rather the juvenile court, which has been intimately involved in the protection of the child, is best situated to make custody determinations based on the best interests of the child *without any preferences or presumptions.*' " (*In re C.M.* (2019) 38 Cal.App.5th 101, 110; see *In re Chantal S.* (1996) 13 Cal.4th 196, 201.)

We review the custody orders for abuse of discretion.  (*In re C.W.* (2019) 33 Cal.App.5th 835, 863.)  " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.  When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.)

Focusing on the final custody order here, father argues that the court abused its discretion by ordering that his visitation with the two older children be monitored, and by declining to provide for joint legal custody over the children.  Specifically, father contends the evidence did not support the court's custody order because the court had before it evidence that father had completed his case plan requirements.  In the section giving reasons for ordering supervised visitations, the court marked checkboxes indicating that father had either not completed or made substantial progress in completing individual counseling to address case issues, including sexual abuse awareness.  Father argues that because he has already completed the case plan requirements, changing the monitored visitation requirement in family court will be very difficult.

The record shows that the court received and considered all of the evidence submitted by the Department and by father.  The

20

court stated that even after examining father's evidence, it was inclined to implement the Department's recommendation, but would consider father's argument with an open mind. Based on the evidence before the court, father cannot show that the court abused its discretion in finding that it was in the children's best interests for mother to have sole physical and legal custody, with monitored visits for father. The Department's report from just a month earlier indicated father had a pending criminal proceeding, remained subject to a 10-year criminal protective order prohibiting him from contacting mother or the youngest child, and would occasionally appear unstable, ranting and accusing mother of planning to sell the children. Although father submitted evidence of completing a sex offender treatment program, the program was from 2014, well before the current case began and well before the court ordered father to participate in individual counseling to address case issues, including sexual abuse awareness. The documentation of father's participation in individual counseling describes his chief complaint as depression, and states the treatment plan was to help father identify triggers and coping mechanisms. Based on this evidence, it does not appear that father had addressed the issues underlying the current dependency action. It was a reasonable inference for the court to conclude that the children's best interests would be served by requiring monitored visits for father and by declining to grant joint legal custody over the children.

## DISPOSITION

The juvenile custody orders are affirmed.
NOT TO BE PUBLISHED.


                        MOOR, J.

We concur:


    BAKER, Acting P. J.


    KIM, J.